UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| TIM ROUNDS,<br><br>    Plaintiff,<br><br> vs.<br><br>THE HARTFORD; HARTFORD FINANCIAL SERVICES, INC.; and HARTFORD CASUALTY INS. CO.,<br><br>    Defendants. | 4:20-CV-04010-KES<br><br><br>ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND ADOPTING IN FULL ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL |

Plaintiff, Tim Rounds, filed a complaint against defendants (collectively, "Hartford") for common law bad faith and for unfair trade practices under SDCL § 58-33-5. Docket 1 at 9. Rounds seeks compensatory and punitive damages and attorney's fees and costs as provided by SDCL §§ 58-12-3 and 58-33-5. *Id.* at 9-10. Rounds moved to compel discovery for 21 discovery requests he made to Hartford, and he requested attorney's fees for the motion to compel.[1] Docket 27; Docket 28 at 5. Hartford opposed the motion to compel and filed a motion for summary judgment. Dockets 46, 52. Rounds opposes

---

[1] Rounds' brief in support of his motion stated that he was seeking to compel discovery for 22 requests, but the brief identifies and discusses 21 requests. *See* Docket 28.

the motion for summary judgment. Docket 81. This court referred the motion to compel to Magistrate Judge Veronica Duffy for ruling. Docket 89. The magistrate judge issued an order granting in part and denying in part Rounds' motion to compel, and granting in part Rounds' request for attorney's fees. Docket 96. Hartford moves to stay the magistrate judge's order, which Rounds opposes, and Hartford filed objections to the magistrate judge's order. Dockets 102, 105, 110.

## FACTUAL BACKGROUND

The facts, viewed in the light most favorable to Rounds, the non-moving party, are as follows:

This case arises from the handling of Rounds' workers' compensation claim. In July 2015, Rounds was working as an insurance adjuster for Doss & Associates. Docket 72-1 at 1. As part of this job, on July 2, 2015, Rounds inspected a damaged steel roof. *Id.* at 5; Docket 72-2 at 7. Because it had rained that morning, Rounds was "slip-sliding all over" while he was on the roof, so much so that he "about went off a couple times." Docket 72-2 at 7, 16. The sliding was serious enough that the owner of the building became concerned. *Id.* at 7. After he got off the roof, Rounds felt "pretty shook up," and "didn't feel comfortable[.]" *Id.* Over the next few days, Rounds' only activities included doing paperwork and spending time with family that was in town for the holiday weekend. *Id.* at 8.

On the afternoon of July 5, 2015, Rounds began experiencing a headache that persisted for the next several days. Docket 72-1 at 20-22. On July 7, 2015, his headache worsened, he became nauseous and dizzy, and he had a hard time moving. Docket 72-2 at 10-11. That evening, he went to a clinic, where he was diagnosed with allergies. *Id.* at 11. The next morning, Rounds went to his family physician, who diagnosed an inner ear infection. *Id.* On Thursday, July 9, 2015, with the symptoms worsening, Rounds went to the emergency room, where he underwent a CT scan and was told he had had a stroke, which was the result of a vertebral artery dissection (VAD). *Id.* at 12-14. Rounds was then flown to a hospital in Sioux Falls for treatment. *Id.* at 13. He remained in the intensive care unit for a few days, and then he spent a week in in-patient rehabilitation. *Id.* at 14. Within a few days after learning he had a stroke, Rounds provided notice to his employer of a work-related injury. *See* Docket 83-1 at 1, 59.

On August 7, 2015, Christy Thomann, the assigned Hartford claims representative, first spoke with Rounds. *See* Docket 72-1 at 4. During this conversation, Rounds said that his doctors informed him that "his stroke was likely due to some form of activity—whiplash, hitting his head, etc.," and that the only corresponding activity was him "crawling on his hands and knees and fe[eling] unsteady" while inspecting the roof. *Id.* at 5. Thomann informed Rounds that for his claim to be compensable, his "work

must [have] contribute[d] in a significant way" to the stroke, and that this determination would "likely . . . boil down to a medical opinion." *Id.*

On September 9, 2015, Jennifer Born, an investigator with Hartford, met with Rounds at his home. Docket 72-2 at 3. During this conversation, Rounds informed Born that his doctors told him his VAD was the result of an injury, which could mean a chiropractic injury, "somebody hit[ting him] in the back of the head, or in a car accident, or a fall, or a hard sneeze." *Id.* at 15. Rounds told her that, after thinking through his activities on the days leading up to the onset of his symptoms, he identified his slipping during the roof inspection as the only possible source of the type of injury his doctors described. *See id.* at 15-16. Born understood from this conversation that "it [was] possible [Rounds] jolted backward during the inspection any number of times when he tried to catch himself." Docket 83-1 at 29. Rounds provided authorization for the insurer to have access to his medical records, and he provided Born with a list of medical providers. *Id.* at 30.

On September 16, 2015, prior to any medical records being received, Kevin Wagenknecht, who was Thomann's supervisor, noted that "[i]t appears that causation is based upon speculation . . . the patient is then guessing it must have happened at work. Is this strong enough evidence . . . in this jurisdiction?" *Id.* at 31. On September 24, 2015, Hartford received medical records from two visits Rounds made to Dr. Noel Chicoine, a family practice physician, in the weeks following his stroke.

Docket 72-3 at 3-4; Docket 83-1 at 32-33. The notes from the first visit do not include any mention of the roof inspection, but the notes from the second visit recount that Rounds "wonders if the stroke may [have] been precipitated by a job he was on that required a large amount of head flexion and rotation while up on a building[.]" Docket 72-3 at 3-4. The notes from the first visit also state that because Rounds "does not have Ehlers-Danlos or Marfan [syndromes] or other similar problems, he likely fits in the category of idiopathic." *Id.* at 3. Later that same day, Wagenknecht entered a note in the claim file stating that "the records . . . state that it is likely that the cause of the injury is idiopathic. Based on this jurisdiction's rules, should we deny the claim?" Docket 72-1 at 11; Docket 83-1 at 40. At this point, Hartford had not yet received all of Rounds' medical records. *See* Docket 83-1 at 40.

Shortly thereafter, Hartford received medical records from a September 25, 2015 visit Rounds made to his neurologist, Dr. Jitendra Sharma. These records recount that Rounds was working on a roof when "he started slipping" and that "he had to catch himself multiple times and hold onto the ladder to maintain his balance." Docket 72-3 at 7. Though Dr. Sharma noted that Rounds did not fall during this time, the notes include that he "almost felt that he may fall from the roof" and that "he may have put some physical strain on his body including his neck during that time." *Id.*

On October 20, 2015, Thomann emailed Rounds, telling him that, once Hartford received all his medical records, then she "would need to obtain a medical causation opinion regarding [his] stroke." Docket 83-1 at 40-41. She also informed him that under South Dakota law, "the work activity must be a major contributing cause" of the stroke to be compensable. *Id.* at 41. Then, on November 6, 2015, Thomann emailed Rounds again, asking him if he had "medical documentation from [his] physician that confirms that the stroke was related to work activity[,]" and noting that from the records she had received, his stroke was "idiopathic." Docket 72-1 at 13-14. Later that same day, Thomann sent Rounds another email, in which she references Dr. Chicoine's notes and states that Rounds' stroke "fits in to the category of idiopathic vs trauma or activity related." *Id.* at 14. She stated that in order for Rounds' injury to be covered, Hartford "must confirm that the injury is related to work activity[,]" but that based on the medical records Hartford had, "this cannot be confirmed." *Id.* Thus, she concluded, Hartford was unable to cover his claim at that time. *Id.*

After these emails, Rounds called Thomann and said that he would have his doctors send her a letter. *Id.* at 15. A few days later, Dr. Sharma sent Hartford an addendum to the notes from Rounds' September 25th visit with him. *Id.* This addendum included Dr. Sharma's opinion that "based on the MRI findings . . . [i]t is possible that when [Rounds] was working up on the roof and was slipping and ha[d] to maintain his balance with some neck

6

strain, that this may have resulted in this stroke." Docket 83-1 at 39. It also noted that "at the same time, it is hard to pinpoint the right time when it all started." *Id.* Soon after, Thomann emailed Rounds once more, attaching the addendum from Dr. Sharma, and informing him that because the addendum "indicates that it is possible that the stroke was caused by the work on the roof," but does not "confirm that this was the cause[,]" his claim would still not be covered. Docket 72-1 at 17. A few days later, Wagenknecht makes a note in the claim file, asking "[h]ow do you expect the court to respond to the doctor's opinion that it may have been the result of the fall? I agree with you that it seems speculative." *Id.* at 18.

Rounds responded to Thomann's email a few days later and provided a written timeline of his activities and symptoms in the days leading up to his hospitalization. *Id.* at 18-24. Rounds stated that "there was no other occurrence that could have resulted in the arterial dissection that fits the timeline[,]" and that "this timeline does pinpoint when it all started." *Id.* at 19, 23. In response, Thomann stated that Hartford "do[es] not question your activities the days before your stroke." *Id.* at 24. She stated further that

> [t]he causes of vertebral artery dissection can be grouped under two main categories, spontaneous and traumatic. Your stroke could have been caused by physical activity, however, as the doctor indicates, he cannot state this for sure. Your stroke may also have been spontaneous, meaning not related to any specific activity.

*Id.* She then informed Rounds again that his claim was not compensable. *Id.*

7

Rounds later retained counsel to assist with his workers' compensation claim. Rounds' counsel sent a letter to Dr. Sharma asking whether, assuming a set of provided facts was correct, he had "a medical opinion given to within[] a reasonable degree of medical probability (i.e. more likely than not)" that Rounds' experience during the roof inspection was "a major contributing cause (at least a 50 percent cause)" of his VAD. Docket 72-5 at 4. The facts in the provided history largely aligned with previous documentation, though with added details, including that Rounds' had one "hard fall," where his "whole body hit the roof," with the "brunt of the force . . . taken by his knee and his hand." *Id.* Dr. Sharma responded that, based on both the "recent information" from Rounds' attorney and on the previously documented information, "the most probable reason" for Rounds' stroke was a VAD that occurred while Rounds was working on the roof. *Id.* at 7.

Rounds' counsel also sent a letter to Dr. Bassel Salem, another of Rounds' treating neurologists, summarizing a recent phone call the two had and asking Dr. Salem to sign the letter if it was "an accurate description" of their conversation and represented his medical opinion. *Id.* at 5-6. Dr. Salem signed this letter, which stated that "Rounds' slip and fall injury was a major contributing cause of his [VAD] and stroke." *Id.* at 6. Rounds' counsel sent his correspondence with Dr. Sharma and Dr. Salem to

Hartford, which received the documents on June 27, 2017. Docket 72-1 at 25.

Rounds filed a petition for workers' compensation benefits with the South Dakota Department of Labor and Regulation on July 19, 2017. Docket 83-1 at 58-59. After initially denying compensability, Hartford later admitted compensability on January 10, 2018, and it paid the claim on August 5, 2018. *Id.* at 65-66, 69-70; Docket 83-3 at 14.

## DISCUSSION

### I. Hartford's Motion for Summary Judgment

#### A. Legal Standard

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the

existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### B. There is a Genuine Dispute of Material Fact Regarding Whether Hartford Acted in Bad Faith in Initially Denying Rounds' Claim

"It is . . . well-settled that in a suit based on diversity of citizenship jurisdiction the federal courts apply federal law as to matters of procedure but the substantive law of the relevant state." *Hiatt v. Mazda Motor Corp.*, 75 F.3d 1252, 1255 (8th Cir. 1996). Here, South Dakota law governs substantive issues. To receive workers' compensation benefits, a claimant must establish that (1) his injury "arises out of and in the course of the employment," and (2) "the employment or employment related activities are a major contributing cause of the condition complained of[.]" SDCL § 62-1-1(7). Employment can be a major contributing cause of an injury even if the injury is less than 50 percent attributable to employment. *See Hughes v. Dakota Mill & Grain, Inc.*, 959 N.W.2d 903, 909 (S.D. 2021). "A medical

10

expert's finding of causation cannot be based upon mere possibility or speculation." *Orth v. Stoebner & Permann Const., Inc.*, 724 N.W.2d 586, 593 (S.D. 2006) (citation omitted). "Instead, '[c]ausation must be established to a reasonable medical probability[.]' " *Id.* (alterations in original) (quoting *Truck Ins. Exch. v. CNA*, 624 N.W.2d 705, 709 (S.D. 2001)). Medical causation opinions must be based on examination of relevant information and must apply the correct standard of causation. *See Hughes*, 959 N.W.2d at 910. The burden is on the claimant to establish compensability by the preponderance of the evidence, *Orth*, 724 N.W.2d at 593, meaning that he must show that each element is "more likely true than not true," *see Stavig v. Stavig*, 774 N.W.2d 454, 459 n.1 (S.D. 2009).

To establish bad faith against a workers' compensation insurance carrier, a claimant must show (1) "an absence of a reasonable basis for denial of policy benefits" and (2) the insurance carrier's "knowledge or reckless disregard of a lack of a reasonable basis for denial or a reckless indifference to facts or to proofs submitted by the insured." *Champion v. U.S. Fidelity & Guar. Co.*, 399 N.W.2d 320, 324 (S.D. 1987) (quoting *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1275 (Colo. 1985)). "An insurance carrier is permitted to 'challenge claims which are fairly debatable,' and therefore, 'will be found liable only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis.' "

*Hein v. Acuity*, 731 N.W.2d 231, 236 (S.D. 2007) (quoting *Champion*, 399 N.W.2d at 324)).

An insurer can also act in bad faith by conducting an inadequate investigation. *Walz v. Fireman's Fund Ins. Co.*, 556 N.W.2d 68, 70-71 (S.D. 1996); *see also Champion*, 399 N.W.2d at 323 ("It is appropriate, in applying the test, to determine whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review[.]" (quoting *Savio*, 706 P.2d at 1275)). Whether an investigation was adequate is a question of fact that turns on the facts and the law readily available to the insurer at the time of the denial of benefits. *Walz*, 556 N.W.2d at 70-71.

A failure to contact individuals with relevant information or to attempt to corroborate statements made by the claimant can create a genuine issue of material fact regarding whether an investigation was adequate. *See Gregerson v. Farm Bureau Prop. & Cas. Ins. Co.*, 462 F. Supp. 3d 952, 971 (D.S.D. 2020); *Dakota, Minn. & E. R.R. Corp. v. Acuity*, 771 N.W.2d 623, 631 (S.D. 2009). Although not required to avoid a bad faith claim, the decision to not have an expert review relevant medical records or to not conduct an independent medical examination is also probative of the adequacy of an investigation. *Compare Etten v. U.S. Food Serv., Inc.*, 446 F. Supp. 2d 968, 977-80 (N.D. Iowa 2006) (denying summary judgment on bad faith claim where claims adjuster, who had no medical training, denied claim based on

12

"speculative inferences" from a "highly selective reading" of medical records, instead of talking to claimant's doctors or submitting records to independent examiner), *with Anderson v. W. Nat'l Mut. Ins. Co.*, 857 F. Supp. 2d 896, 906 (D.S.D. 2012) (granting summary judgment on bad faith claim where insurer "retained outside counsel to render an independent opinion on whether the value of the claim exceeded the [policy] threshold, and had outside counsel consult with a CPA regarding the loss of earnings claim").

Hartford argues that its denial of Rounds' claim was reasonable and fairly debatable because at the time of the denial "there was no evidence to support a causal link between his VAD and any work-related activity" and "all known medical diagnoses at the time were of idiopathic origin." Docket 47 at 2, 11. Hartford also argues that because of this lack of causal evidence and because Rounds never reported to Hartford or his doctors that he fell during the roof inspection, there was no need to ask additional questions of Rounds' doctors or conduct additional investigation. *See id.* at 19.

To support these arguments, Hartford points to notes from two visits Rounds made with Dr. Chicoine, the first of which contains no mention of the roof inspection and includes Dr. Chicoine's view that Rounds' VAD "likely fits in the category of idiopathic." *Id.* at 11-12; Docket 72-3 at 3. The notes from the second visit document that Rounds wondered if the stroke

may have been caused by his activity during the roof inspection, and, according to Hartford, "[d]espite the recitation of this activity, Dr. Chicoine's diagnosis that the stroke was 'idiopathic' does not change." Docket 47 at 12. But this overstates what the medical records show. Dr. Chicoine did not indicate in his notes what impact, if any, the new information about the roof inspection had on his opinion that the VAD was likely idiopathic, and Hartford never followed up with Dr. Chicoine to find out.

Hartford also claims that Dr. Sharma identified the cause of Rounds' VAD as idiopathic. *Id.* But Dr. Sharma's initial notes make no statement about the cause of the VAD—idiopathic or otherwise. Docket 72-3 at 7. The addendum later submitted by Dr. Sharma also does not diagnose Rounds' VAD as "idiopathic." Instead, Dr. Sharma wrote that it was "possible" that Rounds' stroke and VAD were caused by the neck strain he experienced during the roof inspection, but that it was also "hard to pinpoint . . . when it all started." *Id.* at 12. According to Hartford, Dr. Sharma "specifically and carefully" used the word "possible," which Hartford claims makes the injury non-compensable, instead of the word "probable," which would make the claim compensable. Docket 95 at 13. But there is no evidence of how Dr. Sharma selected the word "possible," because Hartford never followed up with him to ask.

Hartford's claim that "all known medical diagnoses at the time were of idiopathic origin" also ignores the statements that Rounds says doctors

14

made to him about the cause of his VAD and stroke shortly after he was
hospitalized. As early as August 7, 2015, Rounds told Hartford that doctors
had explained to him that his VAD and stroke were "likely due to some form
of activity – whiplash, hitting [my] head, etc." Docket 72-1 at 5; *see also*
Docket 72-2 at 15 ("They all talked about an injury . . . They say it could've
been somebody hit me in the back of the head, or in a car accident, or a fall,
or a hard sneeze."). Hartford has not put forward any evidence showing that
it attempted to corroborate whether members of Rounds' health care team
made such statements.

Hartford relies on *Lewison v. Western National Insurance Co.*, 2014 WL
3573403 (D.S.D. July 21, 2014), to argue that speaking with treating
physicians is not necessary to avoid a claim of bad faith when the insurer
has access to all relevant medical records. Docket 95 at 12. But in *Lewison*,
the claimant's physical therapist and chiropractor had the same opinion on
the relevant medical issue, as did the physician who conducted an
independent medical examination. 2014 WL 3573403, at *7. In contrast,
when Hartford denied Rounds' claim, it knew of medical opinions stating
that it was "likely" his VAD was caused by some sort of activity, that it was
"possible" that it was caused by neck strain during the roof inspection, and
that it was "likely" that it was idiopathic. Hartford did not attempt to
reconcile these differing opinions by following up with any of the doctors to
ensure that they had based their opinions on all the relevant information or

15

that they had applied the correct causation standard. *See Hughes*, 959
N.W.2d at 910. Hartford chose instead to selectively focus on the one
opinion that said the cause was idiopathic, which came not from any of
Rounds' treating neurologists, but from a family practice physician. *See
Etten*, 446 F. Supp. 2d at 977-79 (genuine issue of material fact on bad
faith claim where claims adjuster denied workers' compensation claim
based on a "selective[] read[ing]" of chiropractor's treatment notes that were
contradicted by a doctor's notes).

After receiving records from Dr. Chicoine and the initial notes from
Dr. Sharma, Thomann told Rounds that she "would need to obtain a
medical causation opinion regarding [his] stroke." Docket 83-1 at 40-41.
Thomann explained that she would obtain this opinion after all of Rounds'
medical records were received. *Id.* Thus, Thomann initially intended to
obtain a medical causation opinion independent of the medical records, but
then never did so prior to denying Rounds' claim.[2]  Neither submitting
medical records to an expert for review nor conducting an independent
medical examination are required to avoid a bad faith claim, but because
Hartford initially thought it needed some type of independent medical
causation opinion, and then failed to obtain one without explanation, a jury

---

[2] It appears that at some point Hartford did have an expert review Rounds'
medical records and had an independent medical examination conducted. *See*
Docket 83-5 at 2. But these apparently occurred after Hartford initially denied
Rounds' claim, *see* Docket 81 at 20, and Hartford has not introduced any
evidence from the review or examination.

could find that Hartford was acting in bad faith. This is particularly so given that the only medical record Hartford received after Thomann told Rounds she would obtain a medical causation opinion was the addendum from Dr. Sharma, which strengthened Rounds' claim that his VAD was caused by neck strain during the roof inspection. *See* Docket 72-3 at 12.

Hartford also argues that there was no reason for it to conduct further investigation because until Rounds' counsel submitted additional documentation in 2017, Rounds had never reported the kind of injury that can cause a VAD to either Hartford or his doctors. *See* Docket 47 at 19. But this is plainly not true. In statements to Hartford on August 7, 2015, and September 9, 2015, Rounds explained that his doctors told him the VAD was likely caused by some injury, by which they meant something as simple as whiplash or even a hard sneeze. Docket 72-1 at 5; Docket 72-2 at 15. The investigator who spoke with Rounds wrote that "it [was] possible [Rounds] jolted backward" when he tried to catch himself during the roof inspection. Docket 83-1 at 29. The initial notes from Dr. Sharma state that Rounds "may have put some physical strain on his . . . neck" during the roof inspection, and Dr. Sharma's addendum stated that it was "possible" that Rounds' stroke was caused by this neck strain. Docket 72-3 at 7; Docket 83-1 at 39. Thus, prior to denying Rounds' claim, Hartford was

aware that Rounds had experienced the kind of injury that can cause a VAD.[3]

Finally, Thomann's statements to Rounds that incorrectly stated the standard for proving causation creates a genuine issue of material fact as to whether Hartford acted in bad faith. *See Walz*, 556 N.W.2d at 73 ("Insurer has failed to show there is no genuine issue of material facts as to whether failure to timely review pertinent caselaw constituted a 'reckless disregard of a lack of reasonable basis for denial[.]' " (quoting *Champion*, 399 N.W.2d at 324)). In four separate communications to Rounds, Thomann told him that his claim would only be compensable if a doctor could "confirm," or say "for sure," that his injury was work-related. Docket 72-1 at 24; *id.* at 13 (asking for medical records that "confirm[] that the stroke was related to work"); *id* at 14 ("In order for a claim to be covered under Workers' Compensation, we must confirm that the injury is related to work activity."); *id.* at 17 (noting that although Dr. Sharma said it was possible the stroke was caused by work activity, that is insufficient because he "d[id] not confirm that this was the cause"). But Rounds did not have to "confirm" or establish "for sure"

---

[3] Hartford focuses on whether Rounds reported a work-related injury that would qualify as a "trauma." *See* Docket 47 at 4 ("Notably, and of importance in this case, the cause of VAD is categorized as either idiopathic (i.e. spontaneous, with no known cause), or from some sort of trauma."); *id.* at 12 ("[A]t the time of the denial, Mr. Rounds had not reported a work-related fall or trauma to Hartford or any of his physicians."). To the extent that Hartford is arguing that neck strain cannot cause VAD because it is not a traumatic injury, it has not put forward any evidence to support this assertion. *See* Docket 48 ¶ 6 & n.1 (citing only to Wikipedia for the idiopathic v. traumatic categorization).

that work was a major contributing cause, only that work was "more likely than not" a major contributing cause. *Orth*, 724 N.W.2d at 593; *Stavig*, 774 N.W.2d at 459 n.1.

Viewing the facts in the light most favorable to Rounds, the non-moving party, genuine issues of material fact remain regarding whether Hartford conducted an inadequate investigation and whether it knew or recklessly disregarded the lack of a reasonable basis for denial. Thus, Hartford's motion for summary judgment is denied.

## II. Hartford's Objections to the Magistrate Judge's Order on Rounds' Motion to Compel

### A. Legal Standard

The court referred Rounds' motion to compel to a magistrate judge for a determination pursuant to 28 U.S.C. § 636(b)(1)(A). Docket 96. This court may reconsider the magistrate judge's order on the motion to compel only "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). This is a deferential standard where the magistrate judge's order will not be reversed if it "is plausible in light of the record viewed in its entirety." *Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (2007)). "A decision is 'contrary to law' when is fails to apply (or misapplies) relevant statutes, case law, or rules of procedure." *United States v. Red Bird*, 2020 WL 6129634, at

*4 (D.S.D. Oct. 19, 2020) (quoting *Edeh v. Midland Credit Mgmt., Inc.*, 748 F.

Supp. 2d 1030, 1043 (D. Minn. 2010)).

### B. The Magistrate Judge's Discovery Order Is Not Cleary Erroneous or Contrary to Law

Under Federal Rule of Civil Procedure 26, the scope of discovery is as

follows:

> Parties may obtain discovery regarding any nonprivileged matter
> that is relevant to any party's claim or defense and proportional
> to the needs of the case, considering the importance of the issues
> at stake in the action, the amount in controversy, the parties'
> relative access to relevant information, the parties' resources, the
> importance of the discovery in resolving the issues, and whether
> the burden or expense of the proposed discovery outweighs its
> likely benefit. Information within this scope of discovery need not
> be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). "The scope of discovery under Rule 26(b) is

extremely broad." *Burke v. Ability Ins. Co.*, 291 F.R.D. 343, 348 (D.S.D.

2013).

"The requesting party must make a threshold showing that the

requested information falls within the scope of discovery under Rule

26(b)(1)." *Sprint Commc'ns Co. L.P. v. Crow Creek Sioux Tribal Ct.*, 316

F.R.D. 254, 263-64 (D.S.D. 2016) (citing *Hofer v. Mack Trucks, Inc.*, 981

F.2d 377, 380 (8th Cir. 1992)). "Mere speculation that information might be

useful will not suffice; litigants seeking to compel discovery must describe

with a reasonable degree of specificity, the information they hope to obtain

and its importance to their case." *Id.* at 264 (quoting *E.E.O.C. v. Woodmen of

the World Life Ins. Soc.*, 2007 WL 1217919, at *1 (D. Neb. Mar. 15, 2007)).

Once this threshold showing has been made, then the burden shifts to the party resisting discovery "to show specific facts demonstrating that the discovery is irrelevant or disproportional," and it must do so with a "specific showing of reasons *why* the particular discovery should not be had." *Id.* (citation omitted). "[M]ere conclusory objections that something is 'overly broad, burdensome, or oppressive,' is insufficient[.]" *Id.*

Hartford argues that the magistrate judge's order was clearly erroneous and contrary to law "because it failed to consider the proportionality requirement under Rule 26(b)(1) or the merits of the underlying 'bad faith' allegations as set out in the motion for summary judgment."[4] Docket 111 at 8. Thus, Hartford argues, "the discovery ordered is not proportional, not supported by the needs of the case, and improperly imposes class-action-like discovery in a non-class-action case." *Id.* Specifically, Hartford claims that the order was "[c]ontrary to the 2015 amendments" to Rule 26, which "imposed the requirement that discovery be proportional to the needs of the case," and that the magistrate judge's order relied on "case precedent from this District that . . . predated the proportionality amendment[.]" Docket 111 at 8-9. But proportionality "is not a new requirement[.]" *Schultz v. Sentinel Ins. Co., Ltd.*, 2016 WL 3149686, at

---

[4] To the extent that Hartford argues that the discovery is not proportional because there is no genuine dispute of material fact and it is entitled to judgment as a matter of law on the bad faith claim, this argument is now moot given the denial of Hartford's motion for summary judgment.

21

*6 (D.S.D. June 3, 2016) (collecting cases saying the same; Fed. R. Civ. P. 26 advisory committee notes to 2015 amendment ("Restoring the proportionality calculation to Rule 26(b)(1) does not change the existing responsibilities of the court and the parties to consider proportionality[.]") Thus, the reliance on pre-2015 amendment cases is not contrary to law.

### 1. "Chain of Command" Discovery

Hartford objects to the magistrate judge's order regarding several requests for production that involve "chain of command" discovery. Docket 111 at 9-16. These requests seek personnel files, information on compensation and bonuses, training materials, goals and objectives, and some other materials for all persons that handled Rounds' claim, "as well as those persons who supervise those individuals or are in the direct chain of command above them, up to the senior-most person in the chain of command with authority over claims." *Id.* at 10, 13. Hartford claims this is not proportional because Rule 26 requires courts to go beyond the allegations in the complaint and to look at the "actual facts" before entering a discovery order. *Id.* at 14-15. According to Hartford, it "delineat[ed] the facts on which discovery is needed in this case" in its summary judgment motion, and no discovery is needed beyond Thomann and Wagenknecht because Rounds has not put forward any evidence of institutional misconduct. *Id.*

22

But Rule 26 does not require Rounds to prove up his claims before he is entitled to discovery, and as the magistrate judge noted, Rounds is "under no obligation to accept Hartford's version of the facts in lieu of discovery." Docket 96 at 14; *see also Schultz*, 2016 WL 3149686, at *11 ("[Plaintiff] is not under any obligation to accept what amounts to [defendant]'s 'stipulation' to a crucial fact in her bad faith case. She is entitled to prove her facts, and is therefore entitled to seek discovery necessary to prove her facts"). As the magistrate judge explained in the order, such chain of command discovery is relevant and proportional to the needs of this case because Rounds has alleged a pattern of conduct concerning workers' compensations claims, and incentives and instructions given to claims handlers "are likely to be reflected all the way up the chain of command" and may reveal a culture of improper claims handling. Docket 96 at 9-15 (discussing cases in this district allowing chain of command discovery for bad faith claims). Additionally, this discovery is needed to determine whether Hartford's actions were the result of a policy or custom, which goes directly to the issue of punitive damages. *Id.* at 10. Thus, Rounds has made a threshold showing that the chain of command discovery falls within the scope of Rule 26(b)(1).

Hartford cites to *Dziadek v. Charter Oak Fire Insurance Co.*, 2014 WL 820049 (D.S.D. Mar. 3, 2014), to argue that absent evidence of institutional misconduct, Rounds should not be allowed discovery beyond Thomann and

23

Wagenknecht's files and materials. But Hartford omits from its discussion of *Dziadek* that the insurer in that case was required to produce discovery "up to the supervisor of the supervisor of the supervisor" of those involved in the claim. *Id.* at *11. Here, Hartford is arguing that it should not be required to produce discovery for *anyone* above those directly involved in the handling of Rounds' claim. *See* Docket 111 at 10-13. Hartford has also not indicated how many people are in the chain of command, so there is no way for the court to gauge whether the requests for production are as disproportionate and burdensome as it claims. In fact, other than claiming that Rounds must come forward with specific evidence of institutional misconduct before being entitled to discovery, Hartford has not provided any "reasons *why* the particular discovery should not be had." *Sprint Commc'ns*, 316 F.R.D. at 264. Its "conclusory objections" that chain of command discovery is not proportional are insufficient. *Id.*

Hartford also claims that the magistrate judge's order is contrary to law because it "failed to address substantively Hartford's proportionately argument" regarding the requests for chain of command discovery. Docket 111 at 14. The order went through each of the resisted requests for production, outlining the ways in which such discovery is important to resolving the issues in this case. Docket 96 at 9-25. Hartford concedes that it is the only one with access to or the ability to obtain the requested documents. Docket 119 at 5. The magistrate judge also considered, and

24

rejected, Hartford's argument that chain of command discovery is not proportional because Rounds has not shown good cause for such discovery. *See, e.g.*, Docket 96 at 12. Thus, the court finds that the magistrate judge's order regarding the chain of command discovery is not clearly erroneous because it "is plausible in light of the record viewed in its entirety," and it did not fail to apply or misapply the law. *Dixon* 498 F.3d at 847; *Red Bird*, 2020 WL 6129634, at *5.

### 2. Nationwide Discovery

Hartford also objects to the magistrate judge's order regarding several requests for production that involve so-called nationwide discovery. Docket 111 at 17-19. These requests seek the deposition or trial testimony for anyone in the chain of command in extra-contractual workers' compensation lawsuits, documents sufficient to identify all extra-contractual workers' compensation lawsuits, and all documents related to regulatory investigations or actions involving the handling of workers' compensation claims. Docket 96 at 22, 26. Hartford again argues that before Rounds is entitled to this discovery, he must put forward some evidence of a nationwide pattern of misconduct. Docket 111 at 18. Again, there is no such requirement in Rule 26. As the order describes, conduct outside of South Dakota is relevant because it may show a pattern of conduct, provide additional insight into internal procedures, and

demonstrate knowledge of or reckless disregard for wrongful conduct, all of which are relevant for a bad faith claim. Docket 96 at 22-27.

Contrary to Hartford's assertion that the magistrate judge "did not analyze the proportionality issue[,]" the order details the parties' relative access to such documents, noting that "this information is readily available to defendant and is very difficult, if not impossible, for the plaintiff to obtain." Docket 96 at 23 (citing *Lyon v. Bankers Life & Cas. Co.*, 2011 WL 124629, at *11-13 (D.S.D. Jan. 14, 2011)). The order also noted that "[t]o require each plaintiff to go through an identical and expensive discovery process, while defendant has knowledge of other cases in litigation brought against it on other similar types of claims, places defendant at an unusually significant advantage over this individual plaintiff litigant." *Id.* at 24-25. Hartford puts forward no other reasons for why this discovery is not proportional, and thus it has not met its burden in showing that this discovery is outside Rule 26. Thus, the court finds that the magistrate judge's order regarding the nationwide discovery is not clearly erroneous because it "is plausible in light of the record viewed in its entirety," and it did not fail to apply or misapply the law. *Dixon* 498 F.3d at 847; *Red Bird*, 2020 WL 6129634, at *5.

### C. The Court Adopts the Order Regarding Attorney's Fees Under Rule 37(a)(5)(C)

The magistrate judge granted Rounds' request for attorney's fees related to the requests for which the order compelled production. Docket 96

26

at 40. The order analyzed this request for attorney's fees under Rule 37(a)(5)(A), which applies when the motion to compel is granted or the disclosure or discovery is provided after the filing of the motion to compel. But because the magistrate judge granted in part and denied in part Rounds' motion to compel,[5] the request for fees should instead be analyzed under Rule 37(a)(5)(C). The primary difference is that under Rule 37(a)(5)(A), the court *must* award costs, unless certain exceptions, including that the opposing party's position was "substantially justified," apply. Under Rule 37(a)(5)(C), the court *may* award such costs, but the "substantially justified" exception still applies. *See Hurley v. State Farm Mut. Auto Ins. Co.*, 2012 WL 1600796, at *6 (D.S.D. May 7, 2012). Thus, the analysis is basically the same under either provision.

"[S]ubstantial justification means that 'reasonable minds could differ as to whether the party was justified in resisting the discovery sought.' " *Kirschenman v. Auto-Owners Ins.*, 2012 WL 1493833, at *2 (D.S.D. Apr. 27, 2012) (quoting *Oyen v. Land O'Lakes, Inc.*, 2009 WL 536606 (D.S.D. Mar. 3, 2009)). Where there is " 'plenty of law' on whether the information sought was discoverable, substantial justification" does not exist. *Id.* District courts have "wide latitude in discovery, including ordering a Rule 37 monetary award." *Id.* at *1.

---

[5] The magistrate judge denied the motion to compel as to Requests for Production 34 and 36. Docket 96 at 41. Rounds does not object to this denial.

Hartford first argues that the magistrate judge's order on fees was clearly erroneous because the order references Hartford's "repeated delays," which it claims were not the fault of either party, but rather due to health issues Rounds' counsel was experiencing. Docket 111 at 19 & n.5. A finding of "repeated delays," however, is not necessary to award fees, only a finding that Hartford's positions in resisting discovery were not substantially justified.

Hartford argues that it was substantially justified in resisting both the chain of command and nationwide discovery[6] because the 2015 amendments to Rule 26 established a new standard that plaintiffs must show before being entitled to discovery. Docket 111 at 20. As described above, however, proportionality is not a new requirement. As detailed in the magistrate judge's order, there is "plenty of law" establishing that both the chain of command and nationwide discovery are discoverable.

Hartford points to no authority saying that nationwide discovery is not discoverable, and it relies on *Dziadek* to argue that there is contrary case law regarding whether chain of command discovery is appropriate. Docket 111 at 15-16. But *Dziadek* states that "[t]he rulings of this Court require the

---

[6] Hartford did not address Rounds' request for fees in in its response to the motion to compel. *See* Docket 52. It also made no objections to the magistrate judge's order regarding Requests for Production 16, 26, 28, 29, 30, or 33. *See* Docket 111. Thus, the court concludes that Hartford was not substantially justified in resisting these requests for production.

production of the personnel files of the claims handlers . . . and the supervisor of the supervisor of the supervisor of the claims handlers." 2014 WL 820049, at *10. In its objections to the magistrate judge's order, Hartford still maintains that Rounds is entitled only to files relating to the two people directly involved in handling his claim and none of their supervisors. Docket 111 at 10-13. This is not a substantially justified position. *See Kirschenman*, 2012 WL 1493833, at *2 (finding insurance company not substantially justified in refusing to respond to request for upper-level personnel files because "according to established law in this district, upper-level personnel files are discoverable in a case alleging bad faith").

Finally, Hartford argues that its position was substantially justified because it filed a motion for summary judgement concurrent with its response to Rounds' motion to compel. Hartford claims that in doing so it was following the ruling in *Nye v. Hartford Accident & Indemnity Co.*, 2013 WL 3107492 (D.S.D. June 18, 2013), which instructed that "the proper way" for Hartford to argue that it did not act in bad faith "is via a dispositive motion . . . not through discovery objections." *Id.* at *6; Docket 111 at 20. The court does not read *Nye* to say that if a party files a dispositive motion, even if it does so after a motion to compel has been filed, its resistance to discovery will be substantially justified, thus allowing it to escape discovery sanctions. This would be contrary to Rule 37's role in "encourage[ing]

extrajudicial discovery with a minimum of court intervention." *Kirschenman*, 2012 WL 1493833, at *1 (quoting 8B Charles Alan Wright et al., *Federal Practice and Procedure*, § 2284 (3d ed. 2010)).

Rounds' counsel filed an affidavit, statement of time, and brief in support of the application for attorney's fees. Dockets 99, 100. According to these documents, counsel spent 35.6 hours on the motion to compel, excluding time spent on the two Requests for Production for which the magistrate judge did not compel production, and counsel bills at an hourly rate of $250 for such matters. Dockets 99, 100. After adding in the state sales tax of 6.5%, Rounds' counsel seeks payment in the amount of $9,478.50. Hartford does not object to this amount. Docket 118. The court finds that both the time expended and the hourly rate are reasonable. Thus, Rounds is to be awarded $9,478.50 in attorney's fees.

## CONCLUSION

Because there is a genuine dispute of material fact as to whether Hartford acted in bad faith in denying Rounds' workers' compensation claim, Hartford's motion for summary judgment is denied. Because the magistrate judge's order on Rounds' motion to compel is not clearly erroneous or contrary to law, the order is adopted in full. Thus, it is

ORDERED that Hartford's motion for summary judgment (Docket 46) is denied.

It is FURTHER ORDERED that the magistrate judge's order (Docket 96) granting in part and denying in part Rounds' motion to compel (Docket 27) is adopted in full. Hartford shall produce documents responsive to Requests for Production 7, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 23, 24, 26, 28, 29, 30, and 33, as specified in the magistrate judge's order, and Hartford's objections to the magistrate judge's order (Docket 110) are overruled. All responses are due in 21 days.

It is FURTHER ORDERED that Rounds' motion for attorney's fees is granted as to the requests for which production is ordered and denied as to the requests for which production is not ordered. Hartford shall pay $9,478.50 to Rounds' law firm.

It is FURTHER ORDERED that Hartford's motion to stay the magistrate judge's order (Docket 102) is denied as moot.

DATED March 9, 2022

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE

31